**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

**TONYA CREEL,**

Plaintiff,

v.

**SAM JAHANI, D.O.**, and **URGENT CARE, INC., a Colorado Corporation**

Defendants.

---

### TONYA CREEL'S COMPLAINT AND JURY DEMAND

---

The Plaintiff, Tonya Creel, by and through her counsel of record, states the following

Complaint against the Defendants:

## I.   PRELIMINARY ALLEGATIONS

1.    Plaintiff Tonya Creel ("Creel") is a resident of Montrose, Colorado.

2.    Defendant Sam Jahani, D.O. ("Jahani") lives near Delta, Colorado, and is a

physician in private practice in Delta and other Western Slope cities.

3.    Defendant Urgent Care, Inc. ("Urgent Care") is a Colorado corporation that

maintains its principal place of business at 164 W. 3rd Street, Delta, CO 81416.  Jahani is the

principal shareholder of Urgent Care, as well as an officer and director.  At all times relevant to

this suit, Jahani used the corporate form of Urgent Care to provide and bill for medical services.

4.      At all times material hereto, Urgent Care acted by and through its officers, directors, employees and/or agents and is, therefore, vicariously responsible for the actions of said officers, directors, employees and/or agents.

5.      Creel was employed by the Defendants as manager of the medical office at 164 West Third Street in Delta beginning May of 2006.

6.      Pursuant to a two year employment contract entered December 28, 2006, Creel was to remain in the employ of the Defendants until at least December 28, 2008. However, the Defendants unlawfully terminated Creel on December 5, 2008.

7.      While Creel worked for Jahani and Urgent Care, in addition to seeing patients at the office in Delta, Jahani was the owner and medical director of an urgent care facility in Montrose.  He also regularly saw patients at the Delta County Memorial Hospital ("the hospital") in Delta and was medical director for two nursing homes, the Palisade Living Center in Palisade, Colorado, and the Willowtree Nursing Home in Delta.  In the fall of 2008, he opened a second urgent care facility in Grand Junction, Colorado.

8.      This action presents a federal question.  Creel contends that she was retaliated against, in violation of 31 U.S.C. § 3730 (h), a provision of the False Claims Act ("FCA").  This Court has jurisdiction over Creel's FCA retaliation claim pursuant to 28 U.S.C. § 1331.

9.      Creel also asserts ancillary common law claims. This Court has jurisdiction, pursuant to 28 U.S.C. § 1367, over Creel's supplemental, common law claims against Defendants as said claims are so related to the FCA claims that they form part of the same case or controversy.

10.     Venue is proper in this District, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391, because both Defendants reside, can be found and/or transact business in this District, and/or because a substantial part of the events or omissions giving rise to the claim occurred within this District.

11.     This Court may properly exercise *in personem* jurisdiction over both of these Defendants as each has sufficient contacts with the State of Colorado, and with respect to the FCA retaliation claim, the FCA provides for nationwide service of process, 31 U.S.C. § 3732(a). In such circumstances, the relevant inquiry is whether a given defendant has sufficient contacts with the United States as a whole. *Appl. To Enforce Admin. Subp. of S.E.C. v. Knowles*, 87 F.3d 413, 417-419 (10th Cir. 1996). Both Defendants have abundant national contacts.

## II.     FACTS

12.     Creel contends that she was retaliated against or wrongfully discharged because she placed the Defendants on notice, either directly or by and through their agents or representatives, that she was taking, or had taken action in furtherance of a potential FCA *qui tam* action.

13.     The potential FCA violation as to which Creel was acting in furtherance involves the Defendants overcharging Medicare for physician services Jahani, or other Urgent Care physicians provided and the billing of Medicare for patient visits at the hospital and at the nursing homes which Jahani did not actually make.

14.     The time period at issue is from May of 2006 through the date of Creel's termination, December 5, 2008, and upon information and belief continuing thereafter. The information and belief is Creel's knowledge of the Defendants' extensive efforts to keep their

wrongful Medicare billing practices secret, as well as the fact that at the time of Creel's termination reasonable efforts had not been made by the Defendants to stop their wrongful practices.

15.      The alleged Medicare billing fraud which Creel investigated, appreciated and placed the Defendants on notice about included the Defendants' practice of "up-coding" to overuse the 99214 "established patient" billing code at a level which was mathematically impossible, and certainly not warranted by the provided level of care, requiring unnecessary follow-up office visits, billing ordinary care as "urgent," and billing for daily visits to hospital and nursing home patients, when in fact Jahani had not seen the patient.

16.      "Upcoding" is a scheme whereby a provider bills Medicare for a higher level of service than the patient actually received.

17.      For purposes of medical billing, the service a physician provides a patient is identified by a standardized, numerical code called a CPT code.

18.      CPT codes 99212 through 99215 describe four different levels of outpatient physician visits with established patients.  From 99212 through 99215, the corresponding visits involve increasingly more detailed and comprehensive examinations and increasingly more complex medical decision making.  From 99212 through 99215, the corresponding visits require increasing amounts of time spent face-to-face with the patient and are reimbursed by Medicare at a higher rate.  For example, a CPT 99212 visit should typically require 10 minutes of face-to-face contact between the physician and patient while a CPT 99215 visit should typically require 40 minutes of face-to-face contact between the patient and physician.

19.     At the office, Jahani or other Urgent Care physicians completed a "super bill" for each patient seen on a given day, coding the visit according to the above described CPT coding system.

20.     One of Creel's jobs as office manager was to bill patients, insurance companies and Medicare for the alleged services the Defendants claimed to have provided at the office, at the hospital or at the nursing homes.  Creel would enter the information from the physicians' super bills to generate bills to be sent to payers including TrailBlazer Health Enterprises, LLC ("TrailBlazer") and Rocky Mountain Health Plans ("Rocky Mountain"). TrailBlazer is the Medicare administrative contractor through which the Defendants billed Medicare.

21.     In her capacity as office manager, Creel had no authority or discretion to change the CPT billing codes which the physicians provided.

22.     Jahani was previously prosecuted for engaging in Medicare fraud, and thus, was especially sensitive to the ramifications of being accused of partaking in improper Medicare billings.

23.     On January 21, 2003, a Second Amended Complaint was filed in Civil Action No. 3-99CV0807-P in the U.S. District Court for the Northern District of Texas.  The Complaint alleged that Jahani (1) admitted and retained patients in a long term acute care hospital who did not meet the level of care or medical necessity criteria; (2) caused the submission of false claims for skilled therapies which were not provided by qualified staff, not provided for the duration claimed and/or not medically necessary; and (3) billed for inpatient physician and physician assistant services that were not medically necessary.

24.     The complaint was resolved when Jahani entered into a Settlement Agreement with the U.S. Attorney which incorporated a Corporate Integrity Agreement ("CIA").

25.     Pursuant to the CIA which Jahani signed December 3, 2005, he was required to retain an Independent Review Organization ("IRO") which would perform annual audits of a sample of paid Medicare claims.  Robin Linker ("Linker") of Aurora, Colorado, was the IRO the Defendants employed during the time Creel was employed.

26.     Pursuant to the CIA, Jahani was required to develop a set of policies and procedures for employees stating Jahani's commitment to compliance with Medicare requirements and explaining the procedures to be followed to insure accurate billing.  To meet that requirement, Defendants' attorney Anne Branan ("Branan") created Sam Jahani D.O. and Urgent Care, Inc.'s Compliance and Ethics Program Manual ("the compliance manual").  Branan also prepared annual reports required by the CIA.

27.     Pursuant to the CIA, Jahani was required to provide training for his employees on the compliance and ethics program manual and on Medicare billing.  Susan Thurston ("Thurston") of Rifle, Colorado, was hired by the Defendants to do the training.  Thurston and Linker frequently worked together as trainers and IRO's for Medicare providers who are working under CIA's.

28.     In addition to training employees, Thurston worked to insure that the Defendants' employees were following the compliance manual.  Thurston visited the office every month or two, spending one to two hours reviewing records in the computer.  Thurston aided Branan in the preparation of reports submitted to the Office of the Inspector General ("OIG") of the Department of Health and Human Services pursuant to the CIA.

29.     Creel began to believe that Defendants were regularly overbilling Medicare for office visits with established patients by upcoding the visits. She reached this conclusion because Jahani was regularly seeing too many patients each day to be spending the amount of time appropriate for the billing codes he was using to describe the visits.

30.     It was not uncommon for Jahani to see 50 to 60 patients on days in which he spent approximately 6 hours (360 minutes) in his office seeing clients.  Jahani in fact instructed staff members to schedule 12 patients per hour.

31.      On such days, Jahani had between 6 and 7 minutes to spend with each patient. Yet, Jahani routinely billed the overwhelming majority of patient visits as CPT 99214 which typically requires 25 minutes of fact-to-face contact with the patient.  CPT 99213, the code Jahani used the second most often, requires 15 minutes of face-to-face contact.

32.     On a day to day basis, Creel observed that with the number of hours Jahani was in the office seeing patients, the number of patients seen and the billing codes with Jahani and other Urgent Care physicians employed, Jahani was regularly upcoding patient visits and overbilling Medicare.

33.     In addition, Creel learned from talking with patients that Jahani would require a given patient to return for a follow-up visit, when that patient expressed such a follow-up visit was unnecessary.  The Defendants would bill Medicare for these medically unnecessary visits.

34.     Creel also learned Jahani was billing Medicare for ordinary care as "urgent," at a higher billing rate.

35.     Creel also learned that the Defendants were billing Medicare for daily visits to hospital and nursing home patients, when in fact these patients had not been seen by a physician.

36.     Creel's belief about the Defendants' overuse of the CPT 99214 code was independently confirmed in two ways.

37.     Linker performed the first CIA audit at the end of 2006 or in the first part of 2007 and found errors in 5% or more of the sample she examined of claims paid by Medicare.  Both Linker and Jahani told Creel that Linker had determined that the doctor's notes in the examined patient files did not support the level of service at which the visit had been coded and billed.

38.     Also, on October 24, 2008, TrailBlazer sent a letter to the Defendants advising them that their use of CPT codes for office visits was different than that of their peers.  An accompanying chart covering billing from July through December 2007 indicated that Defendants had coded more than 70% of their visits as CPT 99214 (typically requiring 25 minutes) as compared to their peers who on average coded approximately 35% of their office visits that way.   While Defendants coded most of their office visits as CPT 99214, on average, their peers coded most of their office visits as CPT 99213 (typically requiring 15 minutes).  Also, while their peers on average coded approximately 10% of office visits as reflecting less than 10 minutes of face-to-face contact, the Defendants coded only 1% of office visits that way.

39.     Creel began to believe that the Defendants were billing Medicare, through TrailBlazer, for nursing home and hospital visits that were not being made.  Jahani was billing Medicare for visiting patients every day they were hospitalized.  Creel formed the belief that the Defendants were billing Medicare for patient visits that were not being made because of phone calls she received from the nursing homes and the hospital complaining that Jahani had not seen certain patients.

40.     By February 2007, Creel began to report to the Defendants and their representatives that she suspected they were overbilling Medicare by upcoding office visits and billing for nursing home and hospital visits that were not made.

41.     Creel reported her suspicions to Thurston during office visits beginning in approximately February of 2007 and continuing thereafter.

42.     On approximately three different occasions Creel reported her suspicions to Linker.

43.     Creel reported her suspicions to Defendants' attorney Branan in phone conversations beginning as early as November of 2007 and continuing thereafter. Creel specifically told Branan about the details of her investigation and the conclusions she had reached, and that Creel was considering becoming a "whistleblower" to reveal what she knew about the Defendants' wrongful Medicare billings to the government. Branan asked for Creel's email to send her a letter about being a whistle blower and instructed Creel that if I she became a whistleblower, then Branan would not be able to talk with Creel.

44.     On or about April 14, 2008, Thurston returned to the Delta office for another visit. Creel again expressed all the things about which she had concerns.   Creel showed Thurston schedules and reports from the computer.  Thurston said she would send these to Branan and that Creel would need to speak to Branan because this was outside the scope of Thurston's work.

45.     On or about April 16, 2008, Creel called Branan and went through everything that concerned Creel about the Defendants' billing practices. Creel added that Jahani was starting another Urgent Care, yet he was not currently running the Delta office correctly.  Creel told

Branan that it was impossible for one man to do all that Jahani claimed; Jahani was not superman.

46.     In June of 2008, Jahani and Creel had a fight about Jahani's billing practices. During this argument, Jahani grabbed the phone and stated "call Susan….call the OIG I dare you."

47.     During a staff meeting on or about September 14 2008, Thurston stated that compliance and billing really needed to be done correctly, particularly when the doctor is under a CIA.  Christine, Jahani's wife commented: "Isn't the biller more liable than the doctor?" Thurston commented: "Yes, but equally liable as the doctor."

48.     Creel thereafter read the 1500 claim form that states anyone who knowingly bills incorrectly is liable.

49.     As stated above, Linker's first audit evidenced an error rate of 5% or greater. A second audit was due to the government authorities by approximately mid-October, 2008. Linker prepared and submitted a second audit that complied with this deadline.

50.     Upon information and belief, Linker's second audit produced an acceptable error rate of less than 5% only because of the Defendants' machinations.  As in the first audit, Creel transmitted to Linker a list of all Medicare claims paid during the reporting year, and Linker randomly selected claims for review.

51.     Instead of asking Creel to pull the patient files selected for the second audit as Creel had done for the first audit, Jahani had his mother pull the files.  Creel was not involved whatsoever in forwarding the patient files to Linker for review.

52.     Upon information and belief, Jahani dictated new notes for the second audit's selected files in order to justify the CPT codes he had assigned to the visits.

53.     During this time, the transcriptionist told Creel that she had gotten behind because she had been dictating new notes for files for the annual report.

54.     The transcriptionist's regular practice when dictating physician notes a second time was to put both the new date and the original date of transcription on the new or amended notes.

55.     Jahani's mother told Creel that she had personally destroyed the original notes transcribed for the second audit files and had "whited out" the original date from the new notes. No one reviewing the files would have known that the physician notes had been changed.

56.     After the second audit had been completed, Linker told Creel that if she had not added files to the sample the Defendants' error rate would have again reached 5%.

57.     On or about October 27, 2008, Thurston visited the Delta office and Creel was very upset.  Creel told Thurston that she could not, with the available staffing, do all the things that Thurston was saying were out of compliance.  Creel told Thurston that Creel was tired of Jahani not doing the right thing. Creel told Thurston again that she was considering being a whistleblower. Thurston stated that if anyone talked to Creel that "we would be in trouble." Creel told Thurston of the October 24, 2008 letter the Defendants had received from Trailblazer. Creel gave Thurston a copy of this Trailblazer letter and sent one to Branan, even though Jahani told Creel not to send a copy of the letter to Branan.

58.     On October 29, 2008, the Defendants received a letter from Adrienne Shelfer ("Shelfer"), a Program Analyst for the OIG, that discussed the annual reports Shelfer had

received and advised the Defendants that Shelfer was the person responsible for monitoring Jahani's compliance with his CIA.

59.     By October 29, 2008, Creel had enough of the Defendants' dishonesty and the receipt of the Trailblazer letter and Shelfer's letter made her more uncomfortable.  Creel called Thurston and left a message for Thurston to call Creel.

60.     On October 29, 2008, Creel then called OIG representative, Shelfer, and explained to Shelfer who Creel was and where she was employed.  Creel and Shelfer then engaged in an extensive conversation that lasted approximately thirty (30) minutes.  During this conversation, Creel voluntarily disclosed to Shelfer the details of what Creel knew about the Defendants' wrongful practices, including that Jahani had redictated the office notes to match the level of care, that Jahani could not have physically seen the patients for the claimed times and billing codes, that Jahani billed for a higher level of care than was justified, that Jahani required patients to come back for unnecessary visits, that Jahani had a large number of narcotic patients and Jahani required those patients to come into the office for a visit before he would re-fill those narcotic prescriptions, which typically was a perfunctory visit, yet Jahani billed it as a 25 minute visit and that Jahani billed for nursing home and hospital visits which he never attended.

61.     Shelfer and Creel also discussed the Trailblazer letter and its conclusion that Jahani had overused the 99214 code.  Shelfer confided that she had concerns with Linker's audit reports and Jahani's error ratings.  Creel told Shelfer about her prior conversations with Branan, that Creel was considering being a whistleblower, and that Creel was concerned with someone blaming her for the Defendants' wrongful practices.

62.     On October 29, 2008 Creel also talked with Branan.  Creel told Branan that Creel was concerned with Shelfer's letter because it questioned Jahani's error rate, and Creel knew Jahani had redictated the office visit notes to make it look like the level of service complied with the claimed billing code.  Creel then told Branan that she had talked with Shelfer and told Shelfer about the re-dictation. Then Branan stated that she needed to talk to another attorney within her firm and she would call Creel back.

63.     In this same time period, Creel told Linker about what she had learned about Jahani re-dictating his patient notes for the second audit in order to make the level of service match the billing code.  Linker told Creel to tell Thurston what she had learned.  Creel conveyed that information to Thurston when Thurston visited the office on or about October 31st.

64.     On or about November 5, 2008, Branan called Creel and informed her that Robert Nicholson ("Nicholson") an attorney from Branan's office would be coming to talk with Creel about Creel's concerns.  Right after Creel got off the phone with Branan, Creel went and talked to Jahani about this attorney interview.  Jahani told Creel that the attorney was coming "because of what I did."

65.     On or about November 9, 2008, Jahani called Creel at her home to discuss the impending interview with Nicholson.  Jahani led the conversation by stating that "they told me not to talk with you," but because Creel was his employee, he wanted to speak with her.  Jahani told her that they should "be on the same page" concerning the upcoming interview.  Jahani admitted that he re-dictated his file notes for the second audit.  But, Jahani asked Creel to explain that they had only destroyed the first set of dictation and "whited out" the original date on the new notes so that Linker would not be confused.  During this conversation with Jahani, Creel

13

candidly admitted that she had already told Shelfer about Jahani re-dictating his notes for the second audit.

66.     On November 12, 2008, Creel was interviewed by attorney Nicholson and an investigator.  Not long into this interview, Creel appreciated that Nicholson was not there to clean up the Defendants' wrongdoing, but rather his motivation was to hide these wrongs.  Creel thereafter became suspicious and limited the information she provided Nicholson.

67.     On November 13, 2008, Creel held a staff meeting and Creel told those present that she had spoken with the OIG about her concerns with the Defendants' billing practices. Staff member Lu Ann Anderson spoke up and said she was proud of Creel and that she would have done the same thing. Jahani, who attended this meeting, told the staff that if anyone else appreciated similar problems, that they should come and speak to him.

68.     On November 30, 2008, Jahani called Creel and offered to front her money to start her own medical billing business.  Jahani told Creel that he would also sign a contract with her which would allow her to do his billing for three months.  Creel declined.

69.     On December 4, 2008, Creel called two OIG representatives, Shelfer and Don White, and reiterated Creel's concerns with the Defendants' billing practices and told them that she felt that she was being retaliated against.  Creel spoke with Shelfer in the morning – later Shelfer called Creel back to get more information and told Creel that Shelfer was going to have a phone conversation with Branan about Creel's claim of retaliation.

70.     On December 4, 2008, Jahani came to Creel's office and asked whether Creel had "called the OIG again on me?"  Creel told him: "Yes."

71.     On the same day, Creel called Thurston.  Creel told Thurston that she felt she was being retaliated against and told Thurston that she had again spoken to Shelfer.  Thurston chided Creel for not following procedures and first contacting the CIA Compliance Contact, who was Jahani.

72.     On the morning of December 5, 2008, Creel approached Jahani about Creel using her remaining one week vacation before the end of the year; Jahani disputed Creel's entitlement to any vacation. A little while later Jahani came to Creel's office and told Creel that she was no longer the office manager and Creel should only focus on billing.  A few minutes later, Creel questioned Jahani about who was going to fulfill the office manager's responsibilities; Jahani yelled at Creel that she was stressing him out and then asked Creel whether she wanted to take some time off.  At about 3 p.m. that day, Jahani calmly told Creel that he wanted to talk with Creel before she left that day.  A little while later, Jahani's Mom pulled Creel into the kitchen and asked Creel why had she done this – "why didn't you just leave?" Jahani then opened the door to the kitchen and said "Mom, it's over – don't worry about it."

73.     Creel then told Jahani that she did not want to meet with him without a third party present.  Creel gathered her belongings and headed out the front door of the clinic to her car. Jahani's wife chased Creel and stuck a termination letter on Creel's windshield.  Creel thereafter left the parking lot.

74.     The Defendants fired Creel in retaliation of Creel's efforts to notify the government authorities of the Defendants' wrongful practices and/or because Creel had expressed her intent to become a whistleblower.

75.     When Jahani fired Creel, he breached the written contract he had signed promising to employ Creel from December 28, 2006 until December 28, 2008.

76.     Since firing her, Jahani has continued to retaliate against Creel and has interfered with her efforts to obtain new employment.

77.     The last week in December of 2008, Creel learned that there was an opening at the Delta County Memorial Hospital for an office manager for Dr. Jacqueline Garrard ("Garrard").  Creel spoke to Garrard in person, telling her she wanted to apply for the job and handing Garrard her resume.  Garrard told Creel that she would interview her for the job.

78.     However, on or about January 1, 2009, despite the fact that the position had not been filled, Creel received a letter from the hospital telling her she would not be offered the job.

79.     On January 7, 2009, Creel again spoke with Garrard.  Garrard told her that, not only had the position not been filled, no interviews had yet been conducted.  When Creel asked Garrard why she was not being interviewed, Garrard told her that there was nothing she, Garrard, could do about it.  Garrard told her the hiring had to go through the human resources department of the hospital.

80.     Later that day, Creel spoke to the hospital administrator, Tom Mingen ("Mingen").  When Creel asked Mingen why, given her qualifications, she had been eliminated from consideration without even being interviewed, Mingen told her that Jahani had given her a "bad reference."  When Creel asked Mingen what exactly Jahani had said, Mingen answered that Jahani "bad reference" was classified information.

81.     In fact, Creel had not even offered Jahani as a reference.  Creel had only identified Jahani as a previous employer on her resume.  Creel's resume only advised the reader that references were available upon request.

82.     Less than a week after offering to give Creel money to start her own business and to contract with her to do his billing, Jahani wrote a termination letter informing her that her job performance had been deficient and she had failed to insure compliance with federal laws and regulations.

83.     A little more than a month after offering her money to start her own business and a contract to do his billing, Jahani knowingly made false statements to Mingen concerning Creel's job performance which caused Creel to be eliminated from consideration for the position for which she had applied.

### III.     FIRST CLAIM FOR RELIEF - WHISTLEBLOWER LIABILITY

84.     Creel incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

85.     The Defendants retaliated or discriminated against Creel because she placed them on notice that she was going to or had taken action in furtherance of a *qui tam* action, which action included voluntarily disclosing to the government OIG representative, Shelfer, that the Defendants' were wrongfully billing Medicare.

86.     In particular, the Defendants discharged Creel, harassed her and interfered with her attempts to find new employment and otherwise discriminated against her in the terms and conditions of her employment because she investigated and took actions in furtherance of a potential *qui tam* action.

87.     Pursuant to the  retaliatory discharge provisions of the FCA, 31 U.S.C. § 3730(h), Creel is entitled to all relief necessary to make her whole, including, but not by limitation, an award of  twice her back pay with interest and either reinstatement at her same position and salary, or an award for future lost income, certain consequential damages and her reasonable attorneys' fees and costs.

### IV.     SECOND CLAIM FOR RELIEF – COMMON LAW BREACH OF CONTRACT

88.     Creel incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

89.     Creel and the Defendants entered into a written contract on or about December 28, 2006 which provided, *inter alia*, that she would work for the Defendants until December 28, 2008.

90.     The Defendants breached that contract by terminating Creel without just cause on December 5, 2008.

91.     As a direct and proximate result of the Defendants' breach of the contract, Creel has sustained lost wages and benefits and certain consequential damages.

### V.     THIRD CLAIM FOR RELIEF – WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

92.     Creel incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

93.     The Defendants knew or should have known that Creel's complaints about their billing practices were based on her reasonable belief that their conduct was illegal or improper.

94.     The manifest public policy of the State of Colorado is that neither an employer nor an employee should be permitted to knowingly perpetrate a fraud on the federal or state government.  *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992).

95.     The Defendants' termination of Creel was based on her engaging in protected activities including opposing unlawful behavior and opposing the Defendants' improper or illegal actions.

96.     The Defendants' termination of Creel was based on her reporting the Defendants' improper or illegal actions internally and externally.

97.     The Defendants' termination of Creel was based on her exercising her duty to report the Defendants' improper or illegal actions to the OIG.

98.     The Defendants' termination of Creel, therefore, violated the public policy of the State of Colorado.

99.     The Defendants engaged in the above alleged conduct willfully, maliciously, and/or with reckless or callous indifference to Creel's rights, beliefs and feelings.

100.    As a proximate result of the Defendants' actions, Creel has suffered loss of pay and benefits, loss of job, loss of career advancement opportunities, emotional and mental injury, embarrassment, humiliation, loss of self esteem, and other non-economic and economic injuries and losses.

## VI.    FOURTH CLAIM FOR RELIEF – TORTIOUS INTERFERENCE WITH PROSEPCTIVE BUSINESS RELATIONS

101.    Creel incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

102.    The Defendants knew or reasonably should have known of the proposed business relations between Creel and Delta County Memorial Hospital.

103.    The Defendants by words or conduct, or both, intentionally caused Delta County Memorial Hospital not to proceed with the proposed business relations.

104.    The Defendants' interference with the proposed business relations was improper.

105.    The Defendants' interference with the proposed business relations caused Creel to suffer damages, as described above.

## XI.    SIXTH CLAIM FOR RELIEF -  DEFAMATION *PER SE* PRIVATE PERSON/PRIVATE MATTER

106.    Creel incorporates by reference the prior allegations in this Complaint, as though more fully set forth here in.

107.    The Defendants published or caused to be published statements concerning Creel.

108.    The statements were false and defamatory.

109.    Creel has sustained damages as a proximate result of the Defendants' defamation.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiff, Tonya Creel prays for judgment in her favor and against the

Defendants on her retaliation/whistleblower claim as well as her common law claims, prays for

an award of compensatory damages sufficient to make herself whole, prays for pre-judgment and

post-judgment interest, prays for her reasonable expenses, attorneys fees and costs incurred

herein and prays for such further relief as this Honorable Court may deem proper and just.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted May 6th, 2009.

THE LAW FIRM OF MICHAEL S. PORTER

By:   /s/ Michael S. Porter
Michael S. Porter, Esq.
4465 Kipling Street
Wheat Ridge, CO  80033
Telephone:  (303) 940-8370
Fax:    (303) 421-4309
E-mail: porterlaw@comcast.net

Richard C. LaFond, Esq.
Richard C. LaFond, P.C.
1756 Gilpin St.
Denver, CO  80202
Telephone:  (303) 388-4551
Fax:  (303) 388-8324
E-mail:  richardlafondpc@gmail.com

**ATTORNEYS FOR THE PLAINTIFF/RELATOR**
**TONYA CREEL**

<u>Plaintiff's address</u>:
1216 Hemlock Way
Montrose, CO, 81401